BRADLEY T. AND DONNA T., HUSBAND AND WIFE, AS PARENTS, GUARDIANS, AND NEXT FRIENDS OF D.T., A MINOR CHILD, APPELLEES, V. CENTRAL CATHOLIC HIGH SCHOOL, APPELLANT.

653 N.W.2d 813

Filed November 22, 2002.   No. S-01-552.

William A. Francis, of Cunningham, Blackburn, Francis, Brock & Cunningham, for appellant.

James H. Truell, of Truell, Murray & Walters, P.C., for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.
### NATURE OF CASE
Bradley T. and Donna T. as "parents, guardians, and next friends" of D.T., a minor, filed this action in the district court for Hall County on behalf of D.T. against Central Catholic High School (CCHS), of Grand Island, Nebraska, after D.T. was sexually assaulted at CCHS by another student while D.T. was enrolled at the school. Following trial, the jury found in favor of Bradley and Donna. CCHS appeals. For the reasons set forth below, we affirm.

### STATEMENT OF FACTS
On Thursday, November 6, 1997, D.T. was a sophomore attending CCHS. After classes had been dismissed for the day,

D.T. remained at school to participate in conditioning exercises with friends on the wrestling team. She ran the hallways and stairs with the wrestling team for approximately 45 minutes and then went to the stage area in the gymnasium and began operating the wrestling clock, timing wrestlers who were working out. No adults were present in the gymnasium while the students were working out.

While D.T. was sitting on the stage, J.R., also a sophomore at CCHS, entered the stage area of the gymnasium. J.R. had just completed daily conditioning exercises with the basketball team. J.R. tackled D.T. as she was sitting on the stage and began grabbing D.T.'s chest and groin. J.R. then pinned D.T. to the floor, stating, " 'If you don't get up within the next five seconds, you'll have to give me a hand job.' " Another student finally pushed J.R. off of D.T., and D.T. left the stage area and went to the girls' locker room.

Unbeknownst to D.T., J.R. followed her into the girls' locker room, and as D.T. sat down on a locker room bench, J.R. shoved her back onto the bench and straddled her body. No school personnel were present in the girls' locker room.

As he was straddling D.T., J.R. attempted to put his hand up D.T.'s shirt and down her pants. When he was unsuccessful in those attempts, he stood up, pulled his pants down, and attempted unsuccessfully to pull D.T.'s pants down. While his pants were down, J.R. sat on D.T.'s chest and rubbed his exposed penis over her mouth and cheeks. When D.T. would not open her mouth, J.R. pinched her nose to block her breathing, to try to force her to open her mouth. During the trial, D.T. described these events as follows: "And I clenched my mouth even harder and just went — turned my head away, and he kind of laughed and thought it was funny, but that — you know, like it was a game. He did that two or three times, trying to clench my nose." J.R. then stood up, and D.T. was able to get off the bench and leave the locker room.

J.R. followed D.T. after she had left the locker room and was headed toward the school lobby, suggesting to her that her locker door was open and that " '[they] should go check it.' " When D.T. told him that the door was shut, he threatened, " 'Well, I can go open it. Then you'll have to come shut it.' "

Ultimately, D.T. reached the school lobby, where she encountered friends. She caught a ride home with one of these friends.

D.T. did not tell her parents about J.R.'s actions when she reached home. The next day, Friday, November 7, 1997, she reported the incident to Joyce Messing, CCHS' guidance counselor. D.T. testified about her initial meeting with Messing as follows:

> [W]hen I walked in to Mrs. Messing, the first thing I did was start bawling.
>
> . . . .
>
> . . . She asked me what was wrong, and I told her that I had been harassed by — I kept on using the word "harassed." I never used the word "assault," even though that's what it was — I told her by another student. She said, "Wait a second here." She stopped me from going any further, and she mentioned, she goes, "Is this person [J.R.]?" And I said, "Yes." And I didn't know why she guessed, but I said, "Yes."

Messing then asked D.T. to wait while she brought John Golka, the principal of CCHS, into the office. D.T. then informed Golka and Messing about the preceding day's incident involving J.R. Golka told D.T. that he would meet with J.R. on Monday.

On Sunday, November 9, 1997, D.T. told her mother, Donna, about the assault. On Monday, November 10, D.T. returned to school. During the day, she passed J.R. at least twice in the hallway. On these occasions, J.R. would make "gestures" to D.T., such as unbuttoning his shirt. On Monday afternoon, Golka advised D.T. that he had not yet talked to J.R.

On Tuesday, November 11, 1997, D.T. continued to see J.R. in school, where he would give her "weird looks." On Tuesday, Golka required that D.T. produce evidence of the incident with J.R., and during the day, D.T. brought three or four students to Golka to inform him about what they knew concerning the incident. During this period, D.T. spoke with Messing more than once about her apprehension due to continuing to encounter J.R. at school.

J.R. was expelled from school on Wednesday, November 12, 1997, after admitting a portion of the allegations reported by D.T. D.T. learned about J.R.'s expulsion the same day.

Prior to J.R.'s removal from school, Donna had taken D.T. to the Crisis Center and the Family Violence Coalition in Grand Island so that D.T. could receive counseling as a result of J.R.'s assault. On Wednesday, November 12, 1997, a representative of the Family Violence Coalition contacted the Grand Island Police Department regarding the incident. A police officer with the Grand Island Police Department investigated the incident as a sexual assault and spoke to D.T. on November 16.

Shortly after D.T. and Donna had sought help at the Crisis Center, D.T. began to see Linda Renter Beran, a mental health practitioner associated with the Crisis Center. Beran testified at trial over objection. Initially, Beran saw D.T. once a week for 4 weeks. D.T. again had several sessions with Beran in the fall of 1998. Beran testified that D.T. reported that the incident affected her physically, hampered her ability to sleep, caused nervousness and a decrease in her self-confidence, and diminished her trust in the system and in the ability of the people that she would have trusted to protect her.

In addition to D.T.'s testimony recounting the assault, she testified as to the distress she suffered as a result of the incident. D.T. testified that as a result of the assault, she was scared, tense, nervous, and angry. She testified that her grades dropped after the assault and that she stopped participating in afterschool athletic activities because she "was kind of scared." She further testified that following the assault, her relationship with her parents changed in that "my relationship with . . . my parents actually didn't go so well." She stated that the assault also affected her relationship with her friends. "I just felt like nobody else wanted to listen, so I wouldn't talk to anybody, not family, not friends, not boyfriends. Nobody just knew about me. I just kept everything quiet."

Donna also testified at trial concerning the changes she witnessed in D.T. after the November 6, 1997, incident. She stated that before the incident, D.T. had been very talkative, outgoing, and friendly. Donna testified that after the incident, D.T. became "very angry, very controlling, difficult to communicate with, very quiet" and that she ceased to be an outgoing individual. Donna also testified that D.T.'s grades in school dropped, from A's to B's and C's. Following the November 6 incident, Bradley

and Donna took D.T. to her physician at least twice, seeking treatment for D.T.'s inability to sleep and for the stomach pains she was experiencing.

Bradley and Donna brought a two-count negligence action on behalf of D.T. against CCHS, Golka, and Robert Ripp, CCHS' superintendent. During the proceedings, Golka and Ripp were dismissed as defendants. An amended petition was filed on November 13, 2000. In the amended petition, Bradley and Donna alleged that as a result of CCHS' negligence, D.T. had suffered psychological and emotional injury, public humiliation, and pain and suffering associated with the incident, for which Bradley and Donna sought special and general damages. CCHS did not demur to the amended petition.

The 2-day jury trial began on February 5, 2001. The record contains approximately 300 pages of testimony from seven witnesses and seven exhibits. The narrative of events recited above in this opinion is taken from the testimony.

Golka testified at trial. Golka testified, inter alia, that he was aware of a previous incident involving J.R. resulting in a referral in which a female student other than D.T. had alleged that J.R. had inappropriately touched her. At the time of the earlier alleged assault, Golka stated that he had advised J.R. that "if the allegations were true, he'd need to stop. If they were not [true], that then he needed to continue to not engage in anything of that nature." Golka acknowledged that providing for the safety of children attending CCHS was a "top priority" of the school.

Ripp also testified at trial. Ripp agreed with Golka that maintaining a safe environment for students at CCHS was the school's responsibility. During cross-examination, Ripp was asked whether he agreed with Golka that one of the priorities of the school system was to watch out for the safety of the children. Ripp responded, "Absolutely."

Messing also testified at trial. According to Messing, it was her understanding generally that incidents such as that of November 6, 1997, "need[ed] to be immediately reported to law enforcement." She testified specifically that she believed CCHS had an obligation to report J.R.'s assault of D.T. to law enforcement authorities. Messing testified that she felt she had met her obligation when she reported the assault to Golka. Messing testified that

following D.T.'s meeting with Messing and Golka, Messing asked Golka what should be done next, and Golka responded that "he would take care of it." It is uncontroverted that CCHS did not notify law enforcement officials of J.R.'s assault of D.T.

Although the substance of the motion is not contained in the record on appeal, an order entered by the district court reflects that the district court denied CCHS' motion for directed verdict made at the close of all the evidence. The case was submitted to the jury on February 6, 2001. The jury was instructed on both counts I and II. The jury verdict form given to the jury did not separately identify the two counts. The general verdict form stated that the jury finds "for the plaintiff [sic] and against the defendant in the amount of $_____." On February 7, the jury returned a unanimous verdict in favor of Bradley and Donna and against CCHS in the amount of $125,000. The district court entered judgment on the jury verdict. On February 15, CCHS filed a motion for new trial for various reasons, which the district court overruled on April 17. CCHS appeals.

## ASSIGNMENTS OF ERROR

On appeal, CCHS assigns four errors. CCHS claims, restated, that the district court erred (1) in overruling CCHS' motion for judgment on the pleadings, (2) in overruling CCHS' motions for directed verdict, (3) in overruling CCHS' motion for new trial due to an irregularity in the verdict form, and (4) in overruling CCHS' motion for new trial due to an excessive jury verdict.

## STANDARDS OF REVIEW

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Paulk v. Central Lab. Assocs.*, 262 Neb. 838, 636 N.W.2d 170 (2001). A motion for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred. *Suburban Air Freight v. Aust*, 262 Neb. 908, 636 N.W.2d 629 (2001).

The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Id.*

## ANALYSIS

### MOTION FOR JUDGMENT ON PLEADINGS

■ For its first assignment of error, CCHS claims that the district court erred in denying CCHS' motion for judgment on the pleadings. This assignment of error, however, is not argued in CCHS' brief. Errors that are assigned but not argued will not be addressed by an appellate court. *Caruso v. Parkos*, 262 Neb. 961, 637 N.W.2d 351 (2002); *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001).

### MOTION FOR DIRECTED VERDICT

For its second assignment of error, CCHS claims that the district court erred in denying CCHS' motions for a directed verdict made "at the close of Plaintiffs' case and at the close of the evidence." For the reasons stated below, we do not consider this assignment of error.

■ The record reflects that CCHS moved for a directed verdict at the close of Bradley and Donna's case, and the bases for that motion appear and were argued on the record. The district court overruled the motion, and CCHS proceeded to offer evidence. We have long held that a defendant who moves for a directed verdict at the close of the plaintiff's evidence and, upon the overruling of such motion, proceeds with trial and introduces evidence, waives any error in the ruling on the motion. *Spulak v. Tower Ins. Co.*, 251 Neb. 784, 559 N.W.2d 197 (1997). By proceeding with trial and introducing evidence, CCHS waived any error in the district court's ruling on CCHS' motion for directed verdict made at the close of Bradley and Donna's case.

On appeal, CCHS also claims the district court erred in overruling CCHS' motion for a directed verdict at the close of all the evidence. The judge's notes indicate that CCHS renewed its motion for directed verdict at the close of all the evidence, but the record does not contain either the motion or, more particularly, the substance of such motion.

Pages 257 to 259 of the bill of exceptions reflect that after presenting the testimony of several witnesses, CCHS informed the district court that CCHS had no additional evidence. The district court then asked Bradley and Donna if they had any rebuttal evidence, and they stated they did not. After this dialog,

the trial went into recess. Following the recess, Bradley and Donna reopened the record to reflect the parties' stipulation that two of the originally-named defendants were employees of CCHS, acting within the scope of their employment, and as a result, were dismissed from the case. Thereafter, both counsel rested and the case proceeded to closing arguments. The bill of exceptions does not reflect that CCHS moved for a directed verdict at the close of all the evidence or thereafter when the record was reopened to permit the inclusion of the stipulation. Moreover, no written motion appears in the record.

In order to preserve for appeal the question whether CCHS was entitled to a directed verdict, CCHS' renewed motion for directed verdict must appear in the record. See, generally, *State v. Williams*, 247 Neb. 878, 883, 530 N.W.2d 904, 908 (1995) ("[i]t is a basic tenet of Nebraska law that the party appealing has the responsibility for including within the bill of exceptions matters from the record which the party believes are material to the issues presented for review"). A renewed motion for directed verdict need not restate with precision every basis asserted in the initial motion for directed verdict. The two should be considered together. See, *Aronson v. Harriman*, 321 Ark. 359, 901 S.W.2d 832 (1995); *Stacy v. Merchants Bank*, 144 Vt. 515, 482 A.2d 61 (1984). To consider the motions together, however, the substance of the renewed motion must appear in the record. Otherwise, an appellate court has no way of knowing whether grounds remained the same as the original motion for directed verdict.

Because the defense proceeded with trial and introduced evidence, CCHS waived any error in the district court's ruling on CCHS' motion for directed verdict made at the close of Bradley and Donna's case. Because the substance of CCHS' renewed motion for directed verdict does not appear in the record, we have nothing of substance to review on appeal. Therefore, we do not consider CCHS' second assignment of error, because the correctness of the district court's rulings on CCHS' motions for directed verdict is not before us.

### MOTION FOR NEW TRIAL: VERDICT FORM

On appeal, CCHS claims that the district court erred in overruling its motion for new trial due to "irregularity" based upon

the use of a general verdict form by the jury. We reject this assignment of error.

We have previously stated that objections to the verdict form should be made at the jury instruction conference or at the time the verdict is returned. See, *Hiway 20 Terminal, Inc. v. Tri-County Agri-Supply, Inc.*, 235 Neb. 207, 454 N.W.2d 671 (1990); *In re Estate of Kajewski*, 134 Neb. 485, 279 N.W. 185 (1938); *McGrew Machine Co. v. One Spring Alarm Clock Co.*, 124 Neb. 93, 245 N.W. 263 (1932). We have also stated that a failure to raise such an objection constitutes a waiver of the same. See *McGrew Machine Co., supra*. Further, for the sake of completeness, we observe that the use of a general verdict form, even where there are multiple causes of action, may be permissible. See *Gustafson v. Burlington Northern RR. Co.*, 252 Neb. 226, 561 N.W.2d 212 (1997) (citing Neb. Rev. Stat. § 25-1122 (Reissue 1995)).

Nothing in the record of the trial indicates CCHS objected to the verdict form at the jury instruction conference, see *Hiway 20 Terminal, Inc., supra*, or at the time the jury verdict was returned, see *In re Estate of Kajewski, supra*. The record in the instant appeal does not include the jury instruction conference. It is incumbent on the party appealing to present a record which supports the errors assigned, and absent such a record, the decision of the lower court will be affirmed. *Reisig v. Allstate Ins. Co., ante* p. 74, 645 N.W.2d 544 (2002); *Harders v. Odvody*, 261 Neb. 887, 626 N.W.2d 568 (2001). CCHS has failed to present a record supporting the assigned error, and accordingly, we reject this assignment of error.

### MOTION FOR NEW TRIAL: EXCESSIVE VERDICT

The jury awarded Bradley and Donna $125,000 in damages. For its final assignment of error, CCHS claims the district court erred in denying its motion for new trial based upon the claim that the jury verdict was excessive. The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Suburban Air Freight v. Aust*, 262 Neb. 908, 636 N.W.2d 629 (2001). On

appeal, the fact finder's determination of damages is given great deference. *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000); *Seeber v. Howlette*, 255 Neb. 561, 586 N.W.2d 445 (1998).

The record in the instant appeal contains evidence of changes in D.T.'s personality and behavior, the erosion of D.T.'s relationship with her parents, and D.T.'s difficulties with friends, all as a result of the sexual assault and the events which soon followed the assault. D.T.'s grades dropped, and she ceased to participate in afterschool activities. She experienced difficulty sleeping and pains in her stomach, both of which forced her to seek medical attention. Given this record, we determine that the award of damages was not so excessive as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. See, *Norman, supra*; *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 813, 572 N.W.2d 362 (1998). The jury's determination of damages is supported by the evidence and bears a reasonable relationship to the elements of damages proved, and thus, we do not disturb the award on appeal. See *id*. The district court did not err when it denied CCHS' motion for new trial based on the claim of an excessive jury verdict. Accordingly, we find no merit to this assignment of error.

## CONCLUSION

Finding no error in the entry of judgment in favor of Bradley and Donna and against CCHS, we affirm.

AFFIRMED.